## AMOCO PRODUCTION COMPANY and Amoco Rocmount Company, Appellants (Petitioners),

### v.

## WYOMING STATE BOARD OF EQUALIZATION, and its members Nancy Freudenthal, Marvin Applequist and Terry Rubald, in their official capacities; and the Department of Revenue, State of Wyoming, Appellees (Respondents).

### No. 93–104.

Supreme Court of Wyoming.

Oct. 6, 1994.

---

John L. Bordes, Jr., Chicago, IL, for appellants.

Joseph B. Meyer, Atty. Gen., Michael L. Hubbard, Vicci M. Colgan, Sr. Asst. Attys. Gen., for appellees.

Before GOLDEN, C.J., THOMAS, MACY * and TAYLOR, JJ., and CARDINE, J.** Retired.

THOMAS, Justice.

The dispositive issue in this case is whether Amoco Production Company and Amoco Rocmount Company (Amoco) were afforded procedural due process in an administrative proceeding. Amoco sought review by the State Board of Equalization (Board) of the selection by the Department of Revenue (Department) of the comparable value method for gas treated in its processing plants prior to marketing. After a hearing, the Board remanded the proceeding to Department "for adoption of a more determinative formula for computation of comparable value based upon reasonable inferences from third-party natural gas processing fees." The Board order provided the selection of the method would be final, and Amoco was not permitted to participate in the adoption of the more determinative formula. We hold that, in a contested case proceeding, the Board acted "without observance of procedure required by law" (Wyo.Stat. § 16-3-114 (1990)) when it remanded the case to the Department to adopt a more determinative formula. It is clear the formula depends upon factual ascertainment in order to compute those taxes, and Amoco was deprived of participation in the factual development. The Order Affirm-

* Chief Justice at time of oral argument.

** Retired July 6, 1994.

ing the State Board of Equalization is reversed with instructions to remand the case to the Board to determine whether Amoco can be permitted to participate in the development of the more determinative formula and, if it concludes that Amoco cannot participate, then to utilize the proportionate profits methodology proposed by Amoco for valuation of its gas.

In the Brief of Appellants Amoco Production Company and Amoco Rocmount Company, the issues are articulated as follows:

A. Is the District Court's decision affirming the use of the "comparable value" methodology unsupported by substantial evidence and contrary to law?

B. Does W.S. § 39–2–208(d)(ii) permit the use of artificial formulas in determining fair cash market value?

C. Did the District Court commit reversible error when it affirmed the Board's Order granting the Department of Revenue the option of selecting another methodology for production years 1992–1994?

D. Did the District Court commit reversible error when it affirmed the Board's Order permitting the Department of Revenue to develop a new "comparable value" after the hearing was completed and the time for appeal had expired?

In the Brief of Appellees, the Board and the Department set forth the issues in this way:

1. Whether the State Board of Equalization's decision to allow the use of the "comparable value" method to determine fair cash market value comports with law and is supported by substantial evidence.

2. Whether the Board of Equalization acted according to law when it remanded the case to the Department of Revenue.

The genesis of this matter is found in a shift in the method for valuing natural gas production adopted by the Department for the tax year 1991. Pursuant to WYO.STAT. § 39–2–208(d), which was adopted in the legislative session of 1990, the Department selected the "comparable value" method. The significant portion of the statute relating to natural gas provides as follows:

(d) In the event the product as defined in subsection (b) [this subsection includes natural gas] of this section is not sold at or prior to the point of valuation by bona fide arms-length sale, or, except as otherwise provided, if the product of the mine is used without sale, the department shall identify the method it intends to apply under this subsection to determine the fair cash market value and notify the taxpayer of that method on or before September 1 of the year preceding the year for which the method shall be employed. The department shall determine the fair cash market value by application of one (1) of the following methods:

(i) Comparable sales—The fair cash market value is the representative arms-length market price for minerals of like quality and quantity used or sold at the point of valuation provided in subsection (b) of this section taking into consideration the location, terms and conditions under which the minerals are being used or sold;

(ii) Comparable value—The fair cash market value is the arms-length sales price less processing and transportation fees charged to other parties for minerals of like quantity, taking into consideration the quality, terms and conditions under which the minerals are being processed or transported;

(iii) Netback—The fair cash market value is the sales price minus expenses incurred by the producer for transporting produced minerals to the point of sale and third party processing fees. The netback method shall not be utilized in determining the taxable value of natural gas which is processed by the producer of the natural gas;

(iv) Proportionate profits—The fair cash market value is:

(A) The total amount received from the sale of the minerals minus exempt royalties, nonexempt royalties and production taxes times the quotient of the direct cost of producing the minerals divided by the direct cost of producing, processing and transporting the minerals; plus

(B) Nonexempt royalties and production taxes.

WYO.STAT. § 39–2–208(d) (1990).

It appears the Department assumed producers of natural gas, who also were processing their own gas, could establish the "processing and transportation fees charged to other parties for minerals of like quantity * * *" without difficulty. Amoco accommodated to this method of valuation with respect to those gas processing plants at which it actually did process gas for other producers. Amoco's difficulty with the valuation method selected by the Department was that it processed gas for other producers at only two of its plants. Consequently, at some of its other plants, it had no processing and transportation fees charged to other parties to rely upon. Amoco, therefore, proposed that the proportionate profits method be used for those plants, rather than the comparable value method.

Amoco was not able to persuade the Department to adopt its position. Urging the valuation method selected by the Department would not accurately reflect the market value of its natural gas, Amoco, pursuant to WYO.STAT. § 39–2–208(g) (1990),[1] appealed to the Board for a change of method. The Board did hold a hearing in the matter.

In the course of the hearing before the Board, the director of the mineral tax division of the Department testified in part as follows:

Q. Does the Department of Revenue have comparable values for the properties which are the subject of this appeal?

A. I don't have anything in my possession now that documents comparables for any of these plants.

Q. So the answer is "no?"

A. Yes, the answer is no.

Q. If comparable value existed, would the Department of Revenue inform the oil and gas producer-processor of that value?

A. If I had such information would I share it with the producer?

Q. Yes.

A. Yes.

. . . . .

Q. Did you ever propose any rules or regulations regarding the use and application of comparable value?

A. No.

Q. Did you ever advise a producer-processor of oil and gas of the comparable values that he would be required to use?

A. I did not identify specific comparables. The discussions were in general.

Q. Did petitioner ever request an interpretation from the Department of Revenue regarding the application of comparable value?

A. Yes, I received a letter last week requesting a ruling.

. . . . .

Q. You never issued any advisories regarding the comparable value methodology as to how it should be applied?

A. The statute, I think, is specific in that regard specifying that—what comparables are, like quantity and like quality of the product.

After the hearing, the Board made the following finding of fact which is critical to the resolution of this case:

While there is testimony in the record as to example calculations which might be made for natural gas processing fees charged by unrelated parties, there is no evidence as to the actual processing fees or fee arrangements charged to such parties in circumstances similar to those for the natural gas production and processing at issue.

1. WYO.STAT. § 39–2–208(g) (1990) provides:

(g) If the fair cash market value of the product defined in subsection (b) of this section is determined pursuant to subsection (d) of this section, the method employed shall be used in computing taxes for three (3) years including the year in which it is first applied or until changed by mutual agreement between the department and taxpayer. If the taxpayer believes the valuation method selected by the department does not accurately reflect the fair cash market value of the mineral, the taxpayer may appeal to the board of equalization for a change of methods within one (1) year from the date the department notified the taxpayer of the method selected.

In its conclusions of law, the Board ruled the methodology found in the standard of valuation, the comparable value method, applied by the Department was appropriate. Obviously, this method is justified by the statute. We quote further, however, from the conclusions of law in the Board order (emphasis in original order):

10. Consistent with this philosophy, we conclude the reasonableness of using comparable value does not involve "finding" a fee which indeed may not exist as an objective fact. Rather, the reasonableness of the comparable value methodology is tested by whether there exists reliable, available information within the "market" of natural gas processing fees paid by others (i.e., the "known"), which can be used to reasonably infer or **estimate** a just and fair processing fee (the "unknown") that would have been paid by Petitioner had it been in a "third party" producer position vis-a-vis the processing plant. We agree with the Department response that Petitioner is attempting to restrict the statute more severely than what its terms require. For utilization of the comparable value methodology, the only requirement is reliable information from which a reasonable processing fee may be inferred and imputed for Petitioner's production. Such a process does not result in a hypothetical fee inasmuch as the estimated processing fee would be based on an analysis of actual fees.

11. Upon reflection, we conclude the record herein contains insufficient evidence to allow any finding or conclusion as to whether reliable, available information exists from which a reasonable processing fee may be inferred. This insufficiency results from the confusion and disagreement between the Department and producers as to who is responsible for collecting, reviewing and analyzing data from which a reasonable inference may be made as to a processing fee. It is our conclusion this responsibility falls on the Department. If the methodology prescribed by the Department requires inferences for its practical utilization, then the Department must assure the methodology is sufficiently defined and determinative to preclude an assortment of different possible answers to the question of value.

12. In our view, the required definitional and determinative standard has not been met. Instead, the Department seems to have retained all options to disagree at some later date following audit with taxpayer inferences and calculations. Such a scenario was not intended by legislative enactment of W.S. 39–2–208. We conclude the legislature, through this statute, was attempting to move toward "a fair, predictable, understandable and sound tax policy for both the State of Wyoming and the industrial citizens of our State who are vital to the future growth and development. . . ." See, Mineral Taxation Report, Joint Revenue Interim Committee (Feb. 1, 1990). There is no stability, no predictability, in the prescription of a methodology so ill-defined that it cannot be utilized to arrive at a determinative value.

13. We thus conclude the Department is required to establish sufficient parameters or definition for the comparable value methodology so as to allow its utilization by taxpayers reporting production, price, cost and value information pursuant to W.S. 39–2–201. If the Department fails in this obligation, it must be prepared to accept, as the only other authorized statutory valuation method for the production at issue, valuation calculations under the proportionate profits method.

This in substance is the legal rationale which led the Board to its order.

Following its findings of fact and conclusions of law, the Board provided in its order, dated May 26, 1992, as follows:

IT IS THEREFORE HEREBY ORDERED selection of the valuation methodology shall be, and the same is hereby remanded to the Department for adoption of a more determinative formula for computation of comparable value based upon reasonable inferences from third-party natural gas processing fees. Such methodology selection by the Department shall be final, subject only to Board review by individual appeals of specific 1991 production values. If the Department does not adopt

a more determinative methodology within forty-five (45) calendar days from the date of this order, the proportionate profit methodology described in W.S. 39–2–208(d)(iv) shall be used to compute value for the 1991 natural gas production of Petitioner at issue herein, with the Department having the option to select another method for 1992, 1993 and 1994 production pursuant to W.S. 39–2–208(d).

Amoco sought review before the district court of the order of the Board. The district court affirmed the Board's order on March 29, 1993, and Amoco then took its appeal to this court.

■ The difficulty we have with the approach of the Board is that it assigned to the Department the development of facts requisite to arriving at the fair cash market value of the Amoco gas without any opportunity for Amoco to participate in the fact-finding process. We quote from the Determinative Formula for Computation of Comparable Value filed with the Board by the Department:

The guidelines presented below are in addition to and not a replacement for those provided by Wyoming Statute 39–2–208 and the Department's memorandum dated August 30, 1990. These guidelines are applicable for the same time period as set out in the 1990 memorandum—1991–1993 production. The valuation formula is based in part on the best information available to the Department which consists primarily of processing agreements between unrelated parties.

These agreements have been obtained through requests made to various taxpayers and from the Department of Audit. These documents are maintained by the Department as confidential information in accordance with the provisions of W.S. 39–6–309. Some of the data used in the valuation formula has been extracted from these agreements and aggregated to protect the confidentiality of the individual taxpayers.

Ultimately, the issue of valuation must rest upon the facts that were developed as described by the Department's response.

We understand the inherent barrier to participation by Amoco in the development of the formula is that the Department has to

rely upon information collected under a pledge of confidentiality to those supplying it. Amoco argued it could not assume the burden of producing this information because it was held to be confidential by those supplying it. Amoco contended further that, if it were privy to such information, there could develop a concern of price-fixing among the producers. These inherent difficulties, however, do not justify a denial of constitutional due process.

We note in passing that some of the statutory factors are amorphous to a degree. The comparable value method is to be used for minerals of "like quantity," and it is to take into consideration "the quality" and "terms and conditions" under which the minerals are being processed or transported. We recall a similar difficulty with respect to statutory definitions which caused us to require rule making in connection with environmental quality regulations. *Matter of Bessemer Mt.*, 856 P.2d 450 (Wyo.1993).

In this case, the charge to the Department fits within the language of Wyo.Stat. § 39–1–304(c) (1990):

(c) The following shall be adopted in accordance with the requirements and procedures of the Wyoming Administrative Procedure Act:

(i) Adoption of any manual, formula, method or system to be used to determine the fair market value of property for tax purposes * * *.

That provision, however, is found in the powers and purpose of the Board of Equalization, and it does not appear the Department would have that authority. Our mention of this statute probably is in the nature of an aside, because it is obvious the process followed here occurred in the context of a contested case, and there was no effort to pursue the rulemaking requirements of the Wyoming Administrative Procedure Act. We simply suggest, given the language of the statute, there might be some wisdom in pursuing that effort.

We do take cognizance, however, of the procedural statute relating to contested cases, Wyo.Stat. § 16–3–107 (1990), specifi-

cally sub-paragraphs (j) and (k), which provide in pertinent part:

(j) Opportunity shall be afforded all parties to respond and present evidence and argument on all issues involved. Any person compelled to appear in person before any agency or representative thereof shall be accorded the right to be accompanied, represented and advised by counsel or, if permitted by the agency, by other qualified representative.

(k) Every party shall be accorded the right to appear in person or by or with counsel or other duly qualified representative in any agency proceeding in accordance with such rules as the agency prescribes and the pertinent rules of the supreme court of Wyoming. So far as the orderly conduct of public business permits, any interested person may appear before any agency or its responsible officers or employees for the presentation, adjustment or determination of any issue, request or controversy in any proceeding (interlocutory, summary or otherwise) or in connection with any agency function. Every agency shall proceed with reasonable dispatch to conclude any matter presented to it except that due regard shall be had for the convenience and necessity of the parties or their representatives. Any person representing an agency at a hearing in a contested case in which the agency is a party shall not in the same case serve as presiding officer or provide ex parte advice regarding the case to the presiding officer or to the body or any member of the body comprising the decision makers.

Given the tenor of the "Determinative Formula for Computation of Comparable Value," quoted in part above, we must pose the rhetorical question, "What happened to Amoco's procedural rights in this instance?"

 The factual determinations to establish the formula were arrived at by the Board without any participation by Amoco or any opportunity to "respond and present evidence and argument" on all issues involved. We are satisfied the product of the Board's order was to deprive Amoco of due process of law. While it is a principle so obvious that it has received little attention in our jurispru-

dence, there can be no question that due process considerations are invoked in administrative proceedings. *ANR Production Co. v. Wyoming Oil and Gas Conservation Comm'n,* 800 P.2d 492 (Wyo.1990); *Jackson v. State ex rel. Wyoming Workers' Compensation Div.,* 786 P.2d 874 (Wyo.1990). Certainly, a failure to follow the statutory procedures must be considered in determining whether a party has been afforded that process which is due. Furthermore, we have said:

Our cases hold that procedural due process is satisfied if a person is afforded adequate notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Higgins v. State ex rel. Workers' Compensation Division,* 739 P.2d 129 (Wyo.1987), *cert. denied* 484 U.S. 988, 108 S.Ct. 508, 98 L.Ed.2d 507 (1987). In *White v. Board of Trustees of Western Wyoming Community College,* 648 P.2d 528 (Wyo. 1982), *cert. denied* 459 U.S. 1107, 103 S.Ct. 732, 74 L.Ed.2d 956 (1983), we summarize the constitutional principles that are demanded by the Constitution of the United States and prescribe that, where a state seeks to terminate a life, liberty, or property interest, the state must afford notice and an opportunity for hearing, appropriate to the case, before termination. *See Lentsch v. Marshall,* 741 F.2d 301 (10th Cir.1984).

*Robbins v. South Cheyenne Water and Sewage Dist.,* 792 P.2d 1380, 1385 (Wyo.1990).

We fully recognize a difficult conundrum is posed for the Department and the Board by our resolution of this case. It may not be possible for the Department to permit Amoco to participate in the fact-finding process without violating its commitment which, perhaps, is even a legal obligation, to other processors of natural gas with respect to the confidentiality of the information furnished to the Department. If those inhibitions make the hearing we require an impossibility, then it seems clear, and consistent with the order of the Board, that in this instance the proportionate profits method for valuation described in Wyo.Stat. § 39–2–208(d)(iv) must be invoked. A possible alternative is for the Board to pursue a rulemaking proceeding to

adopt the method or the formula for the comparable value method of valuation.

We reverse the order of the district court affirming the order of the Board of Equalization, with instructions that the case be remanded to the Board of Equalization for further proceedings in accordance with this opinion.